Perry v. Simpson Waterproof Manf. Co.

HENRY PERRY vs. SIMPSON WATERPROOF MANUFACTURING COMPANY.

A entered the service of B, who soon thereafter sold and transferred his business to C, after which A continued in the service of C, but supposed that he was in B's employ. B gave no notice to A of the change, and A was chargeable with no laches in not knowing it. Held that B was liable for the wages of A after the sale.

The president of a corporation, as such, has no power to bind the corporation by any act outside of his official duty.

The president, like any other person, may be an agent of the corporation, and that agency may be proved as in other cases of agency.

Where the president of a corporation executed a contract in its behalf, but without authority, and the corporation received and retained the substantial benefit of the contract, the contract was held binding upon the corporation.

The secretary of a corporation, acting also as a general agent, informed the other contracting party that a contract signed by the president for the corporation, was duly executed to bind the company. The party in good faith relied and acted upon such information. Held that the corporation was estopped from denying the president's authority.

The knowledge of an agent in matters pertaining to his agency, and within the scope of his authority, is the knowledge of the principal. This principle is peculiarly applicable to corporations.

And where a corporation has two agents of equal power and authority, notice to one is constructive notice to the other, and therefore notice to the corporation.

The president of a corporation without authority signed the corporate name to a contract; the secretary, who was one of two agents with full power in the premises, knew of the contract and its terms; the other agent knew of the existence of the contract and of some of its provisions; the president and one of the agents were directors; a supplemental agreement relating to the contract was signed by the secretary and performed by the company; the contract was partially executed by the other party as to time, and in respect to the apparent object and purpose of the corporation in procuring the contract it was fully executed; the execution of the contract was intimately connected with important and radical changes in the business affairs of the corporation; and no agent, or other person in behalf of the corporation, objected to the contract or its execution by the other party. Held that the corporation ratified the contract.

The plaintiff contracted to serve the defendants for two years, but was discharged without cause before the expiration of the time. Held that the plaintiff was not entitled to recover the stipulated price for the whole time, but that the court should take into consideration the value of the plaintiff's time to himself for the remainder of the term.

The defendant is liable in such a case only for proximate damages. A loss to the plaintiff resulting from his neglect to use reasonable means to procure other employment, is too remote.

[By CARPENTER, FOSTER, and PHELPS, Js.; BUTLER, C. J. and PARK, J., dissenting.]

ASSUMPSIT for the breach of a contract of the defendants to employ the plaintiff in their service, and for services rendered under the contract, with a general count for work and labor; brought to the Superior Court in Fairfield county, and tried on the general issue with notice, closed to the court, before *Minor, J.* The court found the following facts:

The defendants were a legally incorporated company under the laws of the state of New York, with a capital of $300,000, and had their office in New York city, where their president and a majority of the stockholders and directors resided, and where their meetings were held and records kept. The company leased a factory in Bridgeport, in this state, which was the only factory they operated, and owned most of the machinery therein, and carried on the manufacture of a kind of goods known as enameled cloth, and other oiled goods, in which manufacture they were engaged in the summer of 1865, and had been long previously thereto.

The company needed a competent foreman to manage and oversee the manufacture of their goods at the factory, and previously to September 1st, 1865, their president, Simon Stevens, applied to the plaintiff, and representing himself to be the president of the company, offered him the position of foreman and urged him to accept the same; and at his request the plaintiff went with him to the factory to inspect it and the machinery. The factory was then idle for want of a competent foreman, and the negotiation with the plaintiff was continued at Bridgeport by Stevens and by R. D. McEwen, the secretary of the company. The negotiation resulted in no contract until some time in July, 1865, when McEwen went to Boston, where the plaintiff was engaged in a lucrative contract as head-workman and overseer in a manufacturing establishment in the same line of business with the defendants, at which time and place the contract below given was executed and delivered. It had been previously drawn and was executed on the part of the company in its name by Mr. Stevens, the president, and McEwen stated to the plaintiff that it was duly executed to bind the company.

The plaintiff thereupon signed and delivered it. The contract was as follows:

"An agreement between the Simpson Waterproof Manufacturing Company of New York, by Simon Stevens, its president, of the one part, and Henry Perry, of Newark, New Jersey, of the second part, witnesseth: That the said Simpson Waterproof Manufacturing Company is desirous of procuring the services of said Perry as foreman at the factory of said company in Bridgeport, Connecticut, and said Perry is willing and desirous of entering into the employment of said company in the capacity aforesaid. It is mutually agreed as follows, viz: That in consideration of the entire time and best services of the said Perry to be rendered to said company in the manufacture of leather cloth and other oiled goods, for two years from the 1st day of September, 1865, said company hereby agrees to pay to said Perry for such services the sum of $2,500 per annum, payable in weekly installments of $50, and said company further agrees to give in trust for said Perry fifty shares of the capital stock of said company. But if said Simpson Waterproof Manufacturing Co. shall be sold or transferred to the Bridgeport Rubber Co., then there shall be secured to said Perry one hundred shares of the stock of the Bridgeport Rubber Co., in lieu of the stock of the Simpson Waterproof Manufacturing Co., one-half of said stock to be transferred to said Perry absolutely at the end of the first year and the other half at the end of the second year. Witness our respective signatures at the city of New York this 13th day of July, 1865.

Attest,   THE SIMPSON WATERPROOF MF'G CO.,
George C. Stachweather,  SIMON STEVENS, President.
R. D. McEwen.    H. PERRY."

In less than a week afterwards the plaintiff saw Mr. Stevens in New York, and the latter expressly ratified the contract by word of mouth.

Solely in consideration of the plaintiff's signing the contract, McEwen drew up and signed the following memorandum on the back of the original contract. " The Simpson Waterproof Manufacturing Co., agree to pay to Mr. Henry Perry

forty dollars per week from the 19th day of August to the 1st of September, 1865, in consideration of signing above contract.   R. D. McEwen, Secretary."

The payments provided for in this memorandum were duly made.   In fulfillment of the original contract on his part the plaintiff abandoned his situation in Boston, and on the 1st day of September, 1865, entered into the employment of the defendants at their factory.

There were six directors of the company, among whom were Mr. Stevens, and one Edwin L. Simpson, a stockholder. Simpson and McEwen were the main business men of the company, and in charge of the factory, and were then and during the whole time of the plaintiff's service residing near the factory and attended daily to its concerns, and paid the plaintiff whatever was paid him at the rate of $50 per week for his services.

The defendants objected to the admission of the contract in evidence, as the plaintiff offered no direct evidence of the authority of Stevens as president to execute the instrument. It was found by the court that Stevens, without any authority from the by-laws or articles of the company, and without any vote or other authorization by the board of directors, and without the knowledge of any other person connected with the company except McEwen, executed and delivered the instrument to the plaintiff, and that thereby the plaintiff was induced to come to the factory and render services to the defendants.   It was also found that during the whole time that the plaintiff continued to work at the factory, Stevens and McEwen knew of the terms of the contract and of the amount of compensation to be paid to the plaintiff under it; and that Simpson understood the amount to be paid weekly to the plaintiff under the contract, but knew nothing farther of the existence of the contract or of its terms; and that besides these, there was no evidence that any other officer or director of the company knew of the existence of the contract; also that there was no ratification of the contract by the company or its directors, except so far as such ratification might be inferred from the facts found.   It further appeared that Stevens had never before made any contracts for the

employment of ordinary workmen for the company. Upon these facts the court excluded the contract from consideration so far as the same was offered as a contract binding on the corporation.

At the time the plaintiff came to work at the factory it was in contemplation by the defendants to sell all their property to the Bridgeport Rubber Company, a corporation to be organized under the laws of Connecticut, in which state its president and a majority of its directors and stockholders resided, and having a capital of $150,000, for the purpose of manufacturing all kinds of waterproof goods, and the same kind of enameled goods manufactured by the defendants, but more especially rubber goods, under certain patents held by the Rubber Company. In pursuance of this intention the defendants did, on the 3d of October, 1865, and while the plaintiff was working in the factory, sell and transfer to the Bridgeport Rubber Company all their property, including their lease of the factory, and in good faith delivered possession, and thereafter ceased to have any right or interest in or control over the property or the business carried on in the factory, and the Bridgeport Rubber Company thereafter occupied the factory and held its stockholders' and directors' meetings in the office thereof, and kept all its books and conducted all its business and correspondence in the office and factory under its own name and for its own benefit.

The court however found that no notice whatever of such sale and transfer was given by any one to the plaintiff, and that he was entirely ignorant of the same and so continued until the bringing of the present suit, and supposed during all the time that he was still in the employ of the defendants, and continued to work, as he had begun, without interruption, at the same place, at the same business, and under the same supervision, until February 1st, 1866.

Simpson and McEwen, who had been the managing men of the defendants' company, still continued to be the managing men of the Bridgeport Rubber Company, and as such still continued to direct and pay the plaintiff, and to employ him in the same manner and in the same kind of manufac-

ture as he had been before employed in and during all the time from September 1st to February 1st, there was no apparent change in the business of the establishment, and during all that time the plaintiff fulfilled all the provisions of his contract on his part to be performed and worked faithfully for the interests of his employers.

The plaintiff was regularly paid the sum of $50 per week by Simpson and McEwen up to the 9th day of November, 1865 ; and from that time to February 1st, 1866, the same parties made irregular payments to him, so that at the time of bringing this suit there was due him the sum of $350. At the time of the sale there was nothing due him, but there was no rest in the account, or close of the same with him, at that time or afterwards by the parties making the payments.

On the 1st day of February, 1866, the plaintiff was discharged from all employment in the factory, and refused any future work or pay, without any sufficient reason, and without any reason whatever being given him; and the defendants then refused and have ever since refused to pay him according to the agreement, although he has ever been willing to continue his services, and has repeatedly proffered the same within the life of the contract to Stevens, as president of the defendants' company, and also at the factory building, and demanded that the contract be performed on the part of the defendants, which offers of service and demand have always been refused.

Since his discharge the plaintiff has sought employment of the same character and in the same capacity as that from which he was discharged, and in which for many years he has successfully labored, but during the life of the contract he was not able to find any. He could have found employment of a lower grade as journeyman or common laborer in similar establishments in New Jersey, but not in Bridgeport or its vicinity.

The Bridgeport Rubber Company did not publish its articles of association, as by statute provided, nor deposit the certificates required by law with the secretary of the state and town clerk of the town, until February 26th, 1866, and

until fourteen days after the present suit was commenced. But in all other respects the organization of the company was complete and according to law, and the omissions above stated occurred through the oversight of the secretary and not through any intentional negligence on the part of the corporation or any of its officers.

The plaintiff claimed that facts appertaining to the change from the defendants to the Bridgeport Rubber Company constituted no defence against his claims, and that the change was not effectual and *bonâ fide* as to him, and asked the court so to decide ; but the court decided that the change was effectual and *bonâ fide*, both in fact and as to the plaintiff. The plaintiff further claimed that upon the facts the law was so that he could recover an amount of compensation equal to that specified in the contract for the full time specified therein ; but the court held that he could only recover for the wages unpaid on the first of February, 1866, namely, the sum of $350, and interest thereon.

The defendants claimed that upon the facts they were not liable, either under the written contract, or for any wages that accrued to the plaintiff after the transfer to, and while he was in the employ of, the Bridgeport Rubber Company. But the court rendered judgment against the defendants for the sum of $350, and interest thereon from the 1st day of February, 1866.

Both the plaintiff and the defendants moved for a new trial. The plaintiff also filed a motion in error. The grounds of the plaintiff's motions were, that the court decided—1st, that the contract was not legal and binding upon the defendants ; 2d, that the plaintiff was not entitled to recover the full amount of compensation provided for by the contract and for the full term embraced therein ; 3d, that the change from the defendants to the Bridgeport Rubber Company was, as to the plaintiff and his rights, effectual and *bonâ fide* ; 4th, that the contract was not legally ratified and confirmed by the defendants. The ground of the defendants' motion was that the court held that they were liable for the services of the plaintiff after the transfer of their property to the Bridge-

port Rubber Company and their ceasing to have the benefit of his services.

The case was argued before this court at its February term 1870, by *Sanford* and *E. W. Seymour* for the plaintiff, and by *Treat* and *Blake* for the defendants, and was re-argued at the present term by order of the court.

*Sanford*, with whom was *M. W. Seymour*, for the plaintiff.

Before entering into the discussion of the case, it is important to consider the changes wrought of late in the powers, duties and liabilities of corporations in reference to making contracts. These powers and liabilities have been greatly extended. 2 Kent Com., 291 ; Ang. & Ames on Corp., §§ 112, 228, 237, 238, 240 ; Story on Agency, § 53 ; 1 Parsons on Cont., (5th ed.,) 138. With these principles in view we claim that—

1. The contract in question was legal and binding on the defendants.—1st. Although it does not appear that the president was specially authorized to execute and deliver the contract, yet as no one had special power for that purpose, and the necessity of the company demanded the execution thereof, it was within the general scope of his power. 2 Kent Com., 291, note, 614 ; *Judson* v. *Sturges*, 5 Day, 556 ; *Cabot* v. *Given*, 45 Maine, 144 ; *Beers* v. *Phœnix Glass Co.*, 14 Barb., 358 ; *De Groff* v. *Am. Linen Thread Co.*, 21 N. York, 124 ; *Messenger* v. *City of Buffalo*, id., 196 ; *Smith* v. *Law*, id., 296 ; *Beverly* v. *Lincoln Gas Light Co.*, 6 Adol. & El., 829.—2d. The company are estopped from asserting that the contract was not binding, for the secretary expressly stated that it " was duly executed to bind the company," and the president ratified the same, and both were held out to the world as persons bound to know the proper form of contracting with the company. Story on Agency, § 139.—3d. If a person not duly authorized make a contract for a corporation, and the corporation take and hold the benefit derived from such contract, it is estopped from denying the authority of the agent; or if the agent is held out to the world as authorized. 1 Parsons on Cont., (5th ed.,) 139 ; *Bulkley* v. *Derby Fishing Co.*,

2 Conn., 254; 2 Kent Com., 288, 614; *Hooker* v. *Eagle Bank*, 30 N. York, 83; *N. York & N. Haven R. R. Co.*, v. *Hood*, 22 Conn., 502; *Perkins* v. *Washington Ins. Co.*, 4 Cowen, 645; Ang. & Ames on Corp., § 284; *N. York & N. Haven R. R. Co.* v. *Schuyler*, 34 N. York, 53; *Mumford* v. *Hawkins*, 5 Denio, 355; *Burtis* v. *Buffalo & State Line R. R. Co.*, 24 N. York, 269; *Grosvenor* v. *N. York Central R. R. Co.*, 39 id., 37.

2.  In absence of proof as to how the contract should be executed, it must be held binding. *Sherman* v. *Fitch*, 98 Mass., 59, 63.

3.  There was a sufficient ratification of the contract.—1st. The president and secretary of the company knew of the terms of the contract and that the plaintiff was working under it for the company. Simpson, the superintendent, knew of the amount of salary and times of payment, and that the plaintiff was working for the company. The president, the secretary and superintendent were three of the six directors, the other three being out of the state, and paying no attention to the affairs of the company. *Reuter* v. *Electric Telegraph Co.*, 37 Eng. L. & Eq., 189; *U. States Bank* v. *Dandridge*, 12 Wheat., 68; *Fay* v. *Noble*, 12 Cush., 1. McEwen had as much authority as a " managing man" as Simpson. They two ran the concern like partners. The act of either bound the company. *Howe* v. *Keeler*, 27 Conn., 538.—2d. The company knew of the memorandum endorsed by McEwen on the contract, and of its terms, and faithfully executed it. It would be against sound policy to permit them to avail themselves of so gross negligence as would be implied in their failure to know what the contract was upon which it was endorsed and to which it referred.—3d. The defendants knew their factory was idle for the want of a foreman. They must have known that that want was supplied when their factory resumed operations. Their silence in these circumstances was a ratification. *Peterson* v. *Mayor &c. of New York*, 17 N. York, 453; *Dunn* v. *St. Andrew's Church*, 14 Johns., 118; *Grannis* v. *Branden*, 5 Mass., 80; *Hoyt* v. *Thompson's Exr.*, 19 id., 207; *Bissell* v. *Michigan*

*Southern R. R. Co.*, 22 id., 258 ; *Benedict* v. *Smith*, 10 Paige, 126 ; *St. Mary's Church* v. *Cagger*, 6 Barb., 581 ; *Bank of Columbia* v. *Patterson*, 7 Cranch, 306 ; *Am. Ins. Co.* v. *Oakley*, 9 Paige, 496 ; *Andover &c. Turnpike Co.* v. *Gould*, 6 Mass., 40 ; *Salem Bank* v. *Gloucester Bank*, 17 id., 29 ; *Brigham* v. *Peters*, 1 Gray, 147. By not disavowing the acts of his agent, as soon as they come to his knowledge, a party makes those acts his own. *Benedict* v. *Smith*, 10 Paige, 126 ; *Brigham* v. *Peters*, 1 Gray, 147 ; *Hoyt* v. *Thompson's Exrs.*, 19 N. York, 207.—4th. Notice to the president, secretary and superintendent, they also being directors, was notice to the defendants. *Fulton Bank* v. *N. York & Sharon Canal Co.*, 4 Paige, 127 ; Ang. & Ames on Corp., § 305 ; *Bank of U. States* v. *Davis*, 2 Hill, 452 ; *Farmers' & Citizens' Bank* v. *Payne*, 25 Conn., 444.

4.   The full price for the full term of the contract should be awarded as damages. *Costigan* v. *Mohawk & Hudson R. R. Co.*, 2 Denio, 609 ; *Gandell* v. *Pontigny*, 4 Camp., 375 ; *Shannon* v. *Comstock*, 21 Wend., 457 ; *Husted* v. *Craig*, 36 N. York, 221 ; 1 Parsons on Cont., 519, 520, note ; Sedgwick on Damages, 95, note 2 ; id., 120 and note ; *Remelee* v. *Hall*, 31 Verm., 582.

5.   The change in the corporations was not valid as to the plaintiff. The Simpson Waterproof Manufacturing Company has not ceased to exist as to its legal liabilities; or it is merged into the Bridgeport Rubber Company.

*Treat* and *Bullock*, for the defendants.

1.   The contract was properly excluded as evidence. On its face it does not disclose any authority in Stevens other than as president ; and the principle is well settled that a corporation is not bound by a contract made by its president simply because he is president. *D'Arcy* v. *Tamar, Kit-hill & Callington Railway Co.*, Law Rep., 2 Exch., 158 ; *Bacon* v. *Miss. Ins. Co.*, 31 Miss., 116 ; *Curtiss* v. *Murry*, 26 Cal., 633 ; *Crump* v. *U. States Mining Co.*, 7 Gratt., 352 ; *Mt. Sterling Turnpike Co.* v. *Looney*, 1 Metc. (Ky.,) 550 ; *Olney* v. *Chadsey*, 7 R. Isl., 224 ; *Spyker* v. *Spence*, 8 Ala., 333 ;

*Blen* v. *Bear River & Auburn Co.*, 20 Cal., 602; *Farmers' Bank* v. *McKee*, 2 Penn. S. R., 318; *Ashuelot Manufacturing Co.* v. *Marsh*, 1 Cush., 507; *Hart* v. *Stone*, 30 Conn., 94: *Chicago & Quincy R. R. Co.* v. *Coleman*, 18 Ill., 297; *Hartford Bank* v. *Hart*, 3 Day, 495. But the defendants are a New York corporation, established for manufacturing purposes; and under the laws of that state the trustees, as they are there termed, are entrusted with the entire management of the affairs of the company, including the adoption of by-laws and the appointment of officers. The law of New York is the same as in other states. *Life & Fire Ins. Co.* v. *Mechanics' Fire Ins. Co.*, 7 Wend., 31; *Benedict* v. *Lansing*, 5 Denio, 283; *McCullough* v. *Moss*, id., 575: *Clark* v. *Farmers' Woolen Manf. Co.*, 15 Wend., 256; *Brouwer* v. *Appleby*, 1 Sandf., 158, 171; *Donovan* v. *Mayor &c. of N. York*, 33 N. York, 291. The court will not presume that Stevens had authority. The plaintiff must prove it. He had as president no more authority than any other director. He could bind the company only while acting within the scope of his authority. *Chicago & Quincy R. R. Co.* v. *Coleman*, 18 Ill., 297. Stevens clearly had no express authority. The court finds not only that he had no authority from the by-laws or articles of association, or from the directors, but that of six directors not one besides himself ever saw it, or knew that it was ever made or ever contemplated. He had none by usage. The court finds that " he had never before made any contracts for the employment of ordinary workmen." Usage must be proved. The plaintiff did not show that he ever made a contract of any kind for the defendants. He had none of necessity. If authority be claimed on this ground then such necessity must be the measure of the authority. The plaintiff claims that there was a necessity, and the court finds that the defendants " needed, and that their factory was idle for want of, a competent foreman." Now this must have been a temporary, not a permanent want; an apparent, not a real need. . There was no necessity for the defendants to carry on business at all. Indeed they intended to stop and sell out, of which both Stevens and the plaintiff had knowledge, as

appears in the contract itself. But whether the necessity, if any existed, should be supplied or not, was for the directors to decide. The contract was for two years, the necessity was limited to the term of the defendants' corporate existence. Of course if Stevens, as president, had not authority as president, McEwen had not as secretary.

2. The contract was never ratified. The court finds there was no express ratification by the directors and no knowledge by them of the contract. There can be no ratification without knowledge. Ang. & Ames on Corp., §§ 311, 312, 504. A ratification implies knowledge. *Blen* v. *Bear River & Auburn Co.*, 20 Cal., 602. The plaintiff says the contract was ratified by Simpson and McEwen. The same rule of law applies to them as to Stevens. They could, as agents, bind the company within the scope of their agency or authority. Now, what authority had they ? Here as before the burden of proof is upon the plaintiff. This contract is a very extraordinary one, and the plaintiff must be held to strict and ample proof of authority. As much authority is required to ratify a contract as to make it. " The power to ratify necessarily supposes the power to make the contract in the first instance, and the power to ratify in a given mode supposes the power to contract in the same way." *Zottman* v. *San Francisco*, 20 Cal., 96 ; *Dubuque Female College* v. *City of Dubuque*, 13 Iowa, 555. Neither Simpson as director, nor McEwen as secretary, nor both, could make or ratify the contract. All the court has found is that Simpson and McEwen " were the main business men," were the " managing men," and were " resident near and in charge of the factory, and attended daily to its concerns." For aught that appears, neither nor both of them ever made a contract of any kind, much more one like this. Was their agency or authority, if they had any, joint or separate ? If joint, could one act without the other ? *Kupfer* v. *South Parish*, 12 Mass., 185. If separate, what part of the business did each attend to ? The finding speaks of them only as acting together, and we must take the plaintiff's case as he presents it. The essential ingredients of the contract were price and time.

McEwen knew of both ; Simpson only of the price per week. It is said that notice of the acts of agents will be implied. This is true if the acts were within the scope of their agency and not otherwise. And the same rule applies to the knowledge of agents. *Fairfield County Turnpike Co.* v. *Thorp,* 13 Conn., 173. An estoppel in this case must depend upon knowledge. *Preston* v. *Mann,* 25 Conn., 118. No negligence is imputed to the defendants.

3. The transfer to the new company was valid against the plaintiff. The court finds that the sale was *bonâ fide,* and that the new company was a Connecticut corporation, with a majority of its directors and stockholders residents of the state, organized for the purpose of manufacturing the same goods as the defendants, and also all kinds of waterproof goods, but more especially rubber goods, under certain patents held by the new company. The only ground therefore upon which the plaintiff can claim against us is, that he had no notice of the transfer. But he had notice of our intentions, and his ignorance is his own fault. The court must have found against us upon an implied contract. But the defendants before the sale had no power to make a binding contract with the plaintiff to work for another company. And can an implied contract be enforced which could not be if express ?

4. The plaintiff claims as damages the full price for his full term. He cannot receive wages as such. An action for breach of contract is only for damages. The rule seems not to be well settled. In a recent English case it was holden "that the plaintiff was entitled only to so much as would compensate him for loss of opportunity to earn the contract price, against which should be set something for the saving of his time and labor in not having had to earn it." *McKean* v. *Conley,* 7 L. T., N. S., 828. Substantially the same rule is laid down in other cases, although expressed differently. *French* v. *Brooke,* 4 Moore & Payne, 11. In *Gordon* v. *Brewster,* 7 Wis., 355, the court say: "The rule of damages is the rate of salary from the time of the breach up to the time of trial, less the amount the plaintiff might have earned in the meantime." "The plaintiff is entitled to the actual dam-

ages he sustained in his disappointment and loss of equally profitable employment." *Whitaker* v. *Sandifer*, 1 Duvall, 261. "Actual damages, all the circumstances considered, would be the true measure." *Wright* v. *Falkner*, 37 Ala., 274. The true rule would seem to be that for breach of contract only actual damages can be recovered.

CARPENTER, J. Each party filed a motion for a new trial in this case; the defendants, on the ground that the court erred in ruling that they were liable for the services of the plaintiff rendered for the Bridgeport Rubber Company; and the plaintiff, on the ground that the court erred in ruling that the contract annexed to the finding of the court was not admissible in evidence.

We will first consider the question presented by the defendants' motion. We are all agreed that under the circumstances detailed in the finding of facts, the ruling of the court below, that the plaintiff was entitled to recover for services actually performed, although for another corporation, was correct. It is not denied .that whatever contract there was in relation to such services, whether express or implied, was made with the defendants. He went into their employment September 1st, 1865, and so continued, as he supposed and believed, until February 1st, 1866, when he was discharged. The defendants sold out their business to the Bridgeport Rubber Company about the first of October, 1865; but it was done in such a manner, and the change of business was so made, and the business subsequently so conducted, as to leave the plaintiff entirely ignorant of the change. The defendants failed to notify him that they were no longer carrying on the business. It was clearly their duty to have given such notice if they would relieve themselves of their liability to him. Although the contract signed by him contemplated the possibility, and probability even, that such a change would be made, yet there was no certainty of it, and there is nothing in the contract or in the circumstances of the case to show that the plaintiff was to take notice of the transfer at his peril, or which placed him under obligation to make inquiry.

Of course there was no laches in the plaintiff in remaining ignorant of the transfer. On the other hand, the defendants knew of the transfer as soon as made, and could, without inconvenience, have given the plaintiff notice. Until such notice they remained liable for his services. It is true the Rubber Company were liable upon an implied promise, if the plaintiff had elected to pursue his remedy against them; but that in no way affects the defendants' liability. But it is unnecessary to pursue this branch of the case further, as the views of a majority of the court upon the questions presented by the plaintiff's motion, if sound, show conclusively that the defendants are not entitled to a new trial.

That brings us to consider the question whether the court below did right in excluding the contract as evidence in the cause, on the ground that it could not be regarded as the contract of the corporation.

We think it is quite clear that the president of a corporation, merely as president, has no power to bind the corporation by any act of his aside from his official duties. It is equally clear that the president, like any other person, may be constituted an agent for the transaction of its business. His authority so to act may be found in the charter or by-laws, in a direct vote of the corporation or board of directors, or in usage acquiesced in by the corporation. A corporation will also be bound by the unauthorized acts of its president if it subsequently ratifies those acts, or so conducts itself with reference to them as that it ought to be estopped from denying his authority; and generally, the doctrine of estoppel will apply whenever the corporation receives and retains the benefit of the contract.

Now the consideration of this contract, moving from the plaintiff, is two-fold;—1st, the inconvenience or injury to him in consequence of giving up a lucrative situation; and 2d, services to be rendered by him for the defendants. Those services were chiefly important to the defendants on account of the peculiar situation of their works, then standing idle for the want of a competent foreman, and the skill and experience of the plaintiff in the business in which he was to be

Perry v. Simpson Waterproof Manf. Co.

engaged.  At the request of the president and secretary of
the corporation, the plaintiff relinquished his previous situa-
tion, to his own injury, thereby performing fully his part of
the contract in that respect, and the defendants received the
full benefit of it.  The plaintiff entered the service of the
defendants, and performed faithfully all the duties required
of him, until he was, without cause, and against his will, dis-
charged by the defendants or their assigns.  The services
rendered prior to the transfer to the Rubber Company were
rendered for the defendants; those subsequently rendered
were, as between these parties, and in contemplation of law,
also rendered for their benefit.  As the plaintiff was ready
and willing to fulfil his contract, we may say truthfully, in a
legal sense, that the defendants had the benefit of it; at least
the benefit of services actually rendered, and certainly it was
no fault of the plaintiff that they did not receive the benefit
of his services for the full period of two years.  In estimat-
ing the value of those services to the defendants, it must be
borne in mind that that value consisted, not merely of so
much time devoted to their service, and of the employment
for their benefit of his skill and experience, but it was largely
enhanced by the peculiar circumstances of the defendants.
Their mill had stood idle for two months at least, for the want
of a suitable man to act as foreman in operating it.  They
contemplated a sale of their entire property to a corporation
to be organized under the laws of this state.  In order to
effect an advantageous sale, it would seem important that the
mill should be put in operation.  For that purpose, and until
a sale, the defendants needed a foreman.  After a sale they
did not need one.  For so short a time a competent man
could not easily be obtained.  Probably none could be had
for less than two years; otherwise they would hardly have
employed one for so long a time, especially as they contem-
plated a sale so soon.  In one month after the mill started
the contemplated sale took place, and four months afterwards
the plaintiff was discharged.  It is therefore reasonable to
infer that the principal object had in view by the president
and secretary of the corporation was to place the property of

the defendants in a position to be advantageously sold. No other reasonable construction can be put upon the finding. If a sale could as well have been effected without resuming operations at the mill, why was it not done ? What necessity for contracting with the plaintiff for a term of years extending beyond the contemplated existence of the corporation itself ? But whether we are right in this inference or not is not very material, for it is certain that the corporation chose to use the time, skill and experience of the plaintiff, after subjecting him to the inconvenience referred to, precisely in that way. They deemed it for their interest to do so, and the effect upon the plaintiff was the same whether they originally intended it or not. The corporation therefore received substantially the full benefit of the contract.

In view of these facts, is it consistent with honesty and fair dealing for the defendants, through the instrumentality of this contract, to accomplish their object, and then repudiate the contract and turn the plaintiff out of employment ? Who can believe that the plaintiff, could he have foreseen what was to be, would have entered into this contract ? If not binding, does it not operate as a fraud upon him ? And can this court lend its sanction to a fraud so gross and palpable ?

But there is another ground, as it seems to me, on which the defendants ought to be estopped from denying that this was their contract. The president represented to the plaintiff that he was authorized to sign the contract for the corporation. Before the plaintiff executed it he was informed by McEwen, the secretary, that the contract thus signed " was duly executed to bind the defendants." He relied and acted in good faith upon these representations. If it was a question of diligence on his part, it is difficult to see how he could have done more. To whom else should he have gone for information ? The secretary was the legal custodian of the records of the corporation, and ordinarily, and therefore presumptively in this case, of the records of the board of directors also. It was natural for the plaintiff to presume that he knew what they were, and that he understood the powers

and duties of the agents and officers of the corporation, and especially that he knew who was the proper person to sign contracts in its behalf. I cannot think therefore that there was any laches in the plaintiff.

But in addition to the official character of the men from whom this information was obtained, the case finds that McEwen was in fact, at the time, one of the two " managing men" of the corporation. As it does not appear that the corporation transacted its business through any other agency, we may safely assume that his authority was equivalent to that of a general agent. If so, as he was acting within the apparent scope of his authority, his declaration must be treated as the declaration of the corporation itself. The corporation therefore induced the plaintiff to sign the contract upon the supposition that it was duly executed by the corporation, and ought not now to be permitted to deny it.

But passing from this branch of the case, we will next inquire whether there was a ratification of the contract by the defendants. It is claimed that there was not, because they knew nothing of its terms. We think they had constructive notice at least. It must be presumed that they knew their mill had not been in operation, and that it started again through the agency of the plaintiff on some terms. They must have known also that the position occupied by the plaintiff was a difficult one to fill, for the reason that comparatively few persons could be found who possessed the requisite skill and experience. The sale of the concern was also within their knowledge, and we can hardly suppose that they were ignorant of the fact that the sale might seriously affect the plaintiff in his business relations to the company. If they chose not to inform themselves in respect to these matters, it was doubtless because they were content to leave them to the management and control of their officers. If so, it is difficult to see how their ignorance of the facts can justly and equitably operate to their advantage, and to the injury of the plaintiff.

The supplemental contract, and the action of the corporation under it, bear strongly upon this point. That contract

was annexed to the principal contract, and reads as follows: —" The Simpson Waterproof Manufacturing Company agree to pay to Henry Perry forty dollars per week from the 19th day of August to the 1st of September, 1865, in consideration of signing the above contract. R. D. McEwen, Secretary." That contract was literally performed by the servants and agents of the corporation. It is no longer an executory contract, but is fully executed. We think it must be conceded that the terms of this contract was well known to the defendants. It expressly refers to the principal contract, and is made practically a part of it. It is somewhat unusual, and out of the ordinary course of business, and the object and occasion of making it cannot well be understood without a knowledge of the thing to which it relates. It affords, therefore, strong evidence that the defendants had at least constructive knowledge of the contract in question.

But further, the president of the corporation, and the secretary, who was also one of two " managing men" of the defendants' company, had full knowledge of the contract, and Simpson, the other " managing man" of the company, knew that there was a contract under which the plaintiff was serving, and of the amount to be paid him therefor weekly. It was not the plaintiff's fault, certainly, that he did not understand it fully. In connection with this, it must be remembered that it no where appears that the company had any other agents or superintendents. It would seem therefore that the board of directors or trustees chose to transact the business of the corporation through the agency of these " managing men." The knowledge of an agent, in matters pertaining to his agency, and within the scope of his authority, is the knowledge of the principal. This principle is peculiarly applicable to corporations, which must transact their business through agents. And where a corporation has two agents of equal power and authority, notice to one is constructive notice to the other, and, therefore, notice to the corporation. So far as appears, the authority of these " main business men," as they are also called, was equal and full. The knowledge of McEwen pertained to business within the

scope of his authority, and was the knowledge of the corporation itself. *Farmers' & Citizens' Bank* v. *Payne,* 25 Conn., 444 ; Angell & Ames on Corporations, §§ 305, 306.

The case then stands thus : The president and secretary had full knowledge of this contract ; the secretary was also one of two agents with full power in the premises, and as such agent had full knowledge ; the other agent knew there was a contract, and knew of some of its provisions, with every facility for informing himself fully ; he and the president were directors of the corporation ; a supplemental agreement, which could not be understood without knowledge of the contract, was signed by the secretary for the corporation, and was fully performed by the corporation ; the contract was partially executed by the plaintiff as to time, and, so far as the motives and purposes of the defendants were concerned, was fully executed ; and the execution of the contract was so connected with important and radical changes in the business affairs of the corporation, that the stockholders must be presumed to have had, at least, a general knowledge of the transaction. In the light of these facts to permit the corporation to deny its knowledge of this contract would establish a dangerous precedent. If it had knowledge then there was a ratification ; for there is no pretense that any officer, or other person connected with the company, ever intimated to the plaintiff any objection to the contract. Under these circumstances, and for these reasons, a majority of the court do not hesitate to hold that there has been a ratification of this contract by the defendants, and that the plaintiff is entitled to a new trial.

In relation to the question of damages, we are clearly of the opinion that the plaintiff is not, necessarily, and as matter of law, entitled to recover the full price for the full term of the contract. The defendants violated their contract, and the plaintiff suffered damage. The injury sustained is the measure of damages. That is ascertained by considering how much he could have earned at the contract price during the balance of the term, taking into consideration the sum payable weekly, and also the value of the stock stipulated for in

the contract. From this should be deducted the value of the plaintiff's time to himself. In estimating that, all the circumstances will be considered—the facilities or difficulties in finding employment, and the amount actually earned, or which he might, by the use of reasonable diligence have earned. 3 Parsons on Contracts, 189; *Remelee* v. *Hall*, 31 Verm., 582.

Of course the plaintiff would not be justified in remaining idle for the whole time. He will not be permitted to increase the damage to himself unnecessarily, at the expense of the defendants. He is bound to use ordinary diligence. The defendants are only liable for proximate damages. Such damages as result from his own negligence, or want of proper diligence, are too remote, and not chargeable to the defendants. Upon the same principle he has no right to insist upon employment in the same business or at the same price. If that is not to be had, he is bound to engage in other business, and, if need be, at a less price.

There may be other matters which should be taken into consideration, but we have no occasion to refer to them now. The damages here considered are over and above the value of services actually performed.

We advise a new trial on the plaintiff's motion.

In this opinion FOSTER and PHELPS,* Js., concurred; BUTLER, C. J., and PARK, J., dissented.

PARK, J. Stevens, the president of the defendant company, was the only person who attempted to make the contract in question with the plaintiff in behalf of the company. He doubtless supposed that he had sufficient authority as president to make the contract. This appears from the contract itself, and from his declarations to the plaintiff at their first interview, and from his attempted ratification of the contract soon after it had been executed by the plaintiff. No doubt McEwen, the secretary, who procured the plaintiff's signature

---

*Judge PHELPS of the Superior Court was called in to sit in the place of Judge SEYMOUR, who having been counsel in the case when at the bar, did not sit.

to it, was laboring under the same mistake. He informed the plaintiff that the contract as executed by the president was duly executed to bind the defendants. Nothing appears in the case tending to show that they intended any fraud in making these representations, and we are therefore bound to presume that they made them honestly, through misapprehension of the law.

The majority of the court concede that Stevens, merely as president, had no authority to bind the defendants, and it is therefore unnecessary to cite authority to that effect.

The court below finds that no general or special authority was conferred upon Stevens to make the contract, and that there was none from usage. I cite from the finding:—" It appeared and is found by the court that Stevens, without any authority from the by-laws or articles of association of the company, and without any vote or other authorization by the board of directors, and without the knowledge of any other person connected with the company, except the secretary, McEwen, executed and delivered said instrument to the plaintiff. It further appeared that Stevens had never before made any contracts for the employment of ordinary workmen for the company."

It follows then, if this contract was the contract of the defendants, that it became such by their ratification of it with full knowledge of all its terms; or it became their contract because the facts of the case show that the defendants are estopped from denying the authority of the president to make it. It seems to me there is no foundation in the case for either of these claims. It appears by the finding that, aside from the president and secretary, no officer or stockholder of the company knew even of the existence of the contract, and much less its terms. I cite again from the finding:—" It appeared that during the whole time that the plaintiff continued to work at the factory, the president and secretary knew of the full conditions and terms of the contract, and of the amount of compensation to be paid the plaintiff under it, and that Simpson understood the amount to be paid weekly to the plaintiff under the contract, but knew nothing farther

of its existence or terms·; and that besides these there was no evidence that any other officer, or director of the company at any time knew even of the existence of the contract, or of its terms, and conditions." On this finding I am unable to discover how it can be said that the officers and members of the company ratified this contract, respecting which they knew nothing whatsoever, or that they bound themselves to the consequences of an estoppel in pais, when they had never held out their president to the world, or to the plaintiff in particular, as having authority to make this or any other contract in their behalf.

· I am not now considering what effect McEwen's knowledge of the contract may have had on the company, but independently of that knowledge it was claimed that the defendants are liable, because they received and retained the benefit of the contract. The chief benefit resulting from the contract is said to be, the putting of the mill in running order preparatory to an advantageous sale. It is said that the mill was lying idle for want of a competent foreman and had been for two months; that the company contemplated a sale of the property, and in order to make a good sale it was important that the mill should be put in operation. The plaintiff put the mill in operation; a sale was effected; and so it is said the defendants reaped the chief benefit of the contract. It is singular, if it was so important that the mill should be in operation in order to effect an advantageous sale, that the defendants should have commenced the negotiations for the sale as far back as the thirteenth of July, when the claim is that the mill was lying idle. One would suppose, if it was ever important to have the mill in operation, it was doubly so at this time, in order to create a favorable impression at the commencement of the negotiations. The prospective members of the future Rubber Company resided in Bridgeport, in the immediate vicinity of the defendants' mill. They certainly had the fullest opportunity to inform themselves respecting the character of the mill and its operations, and after commencing, and continuing the negotiations for the period of seven weeks, it can hardly be supposed that they remained

ignorant of its character. And furthermore, it would seem that negotiations must have far progressed towards the completion of the contract on the first of September, when the plaintiff commenced work, for within one month and three days from that time the Rubber Company was organized and the property transferred.

It seems to me that the president and secretary must have been utterly wanting in judgment if they supposed that the advantages to be derived from having the mill in operation during the remainder of the negotiations would justify the expense of engaging a competent foreman, whose services were to commence some seven weeks thereafter, at an outlay of $5,000 and fifty shares of the defendants' stock, when the negotiations were liable to terminate at any time if a sale of the property should be made.

Again, it is singular, if this was the chief object in view in making the contract, that the plaintiff should have been hired for so long a period. I know it is claimed that the probability was that a competent foreman could not have been engaged for a shorter time. The finding is silent upon the subject. If this was an important fact in the case the plaintiff was bound to show it, but instead of doing so it does not appear even by his testimony that any effort was made to engage his services for a shorter period. At all events, it is easy to see that if the plaintiff was willing to work two years for the sum of $5,000 and fifty shares of the defendants' stock, he must have been willing to work one month for much less compensation. One would suppose that he could easily have made an arrangement with his employers to be absent from their service for so short a period. But be this as it may, all speculation upon this subject is mere conjecture.

Again, it seems to me that in other respects more is claimed from this part of the case than the finding will warrant. It does not appear how long work was suspended at the mill for the want of a competent foreman. The finding simply says that when the plaintiff visited the mill, at the request of the president to inspect the machinery, the factory was found idle for the want of a competent foreman. How long it had

remained idle, or how long it continued so to remain, is left wholly to conjecture; but still it is said that it remained idle for the space of two months at least. But suppose the fact to be as claimed, that the chief object of the contract was the putting of the mill in order for a successful sale; and suppose that so much of the benefit resulting from the contract was enjoyed by the defendants, is it so that this is sufficient, under the circumstances of the case, to bind the defendants to the full extent of the contract?

Suppose I am a farmer, and owing to the peculiar circumstances in which I am unexpectedly placed, I find myself in need of a competent man to take charge of my farm for a few days. My servant knows my need, and without any authority engages a man for me, and I find him at work on my farm under circumstances that lead me to suppose he has been engaged by the day, and I pay him accordingly. At the end of ten days I ascertain that my servant made a contract with him for a term of years. Am I bound by the contract simply because I have received the benefit of his labor for the ten days I was in need of help, although the service has been rendered on a pretended contract for a term of years payable by the day? It seems to me there is no need of answering the question, for every lawyer must admit that I would not be liable farther than for the service actually rendered. To hold me liable on the contract I must know, while the service is being rendered, what the contract was that my servant attempted to make. Without such knowledge I venture to say a case cannot be found in all the books that would hold me liable. The party dealing with my servant must see to it that I have such knowledge, or he runs his risk. In the sale of chattels it is said "let the buyer beware;" so it may be said of a man dealing with a party who claims to be the agent of another—let him beware. Let him beware of the representations of authority that are made, for he takes them at his risk. Story on Agency, § 133. How does this case differ from the one we have in hand, so far as the question I am considering is concerned? It seems to me they are identical in principle.

Again, it is claimed by the plaintiff that the defendants are liable to the full extent of the contract, because the president represented to the plaintiff that he had authority to bind the defendants, and that the secretary afterwards informed the plaintiff that the contract as signed was duly executed to bind the defendants. It is said in the first place, that the secretary was the custodian of the defendants' books, and must be presumed to have known what the authority of the president was. It is conceded that the president had no authority in fact to make the contract, and that the declarations of the president and secretary were untrue. What additional force the declarations had because they were made by the secretary it is difficult to see. It is said that they show that the plaintiff exercised due diligence to inform himself whether the president had authority to make the contract or not. But the question is not one of diligence. The plaintiff was bound to know whether the president had authority or not. The defendants are not to be held bound by a contract they never made, because the plaintiff was informed, as he thought reliably, that the president had authority in the premises. No amount of such information would avail anything if the fact was not so. Story on Agency, § 133 ; 1 Swift Dig., 329. The question here is one of authority in fact, and not one of diligence.

But much reliance was placed upon the fact that the secretary was one of the "managing men" of the company; and it was claimed that, inasmuch as it does not appear that the defendants transacted their business through any other agency, we may safely assume that his authority was equal to that of a general agent, and that his declarations to the plaintiff must therefore be treated as the declarations of the defendants. To this claim I have several answers to make, which convince me that it is not sound.

In the first place, if the secretary was clothed with the authority of a general agent, it was a fact all essential for the plaintiff to prove, and should not have been left to be inferred from the fact that it does not appear that the defendants transacted their business through any other agency. The

plaintiff is bound to make out his case affirmatively, and if any essential fact is not proved, the contrary is to be taken as true.

Again, what authority the secretary had as one of the " managing men" is left exceedingly in doubt by the finding. The foreman of a weaving shop may be called a " managing man." Any man who has any power to direct others in any line of business, or any control over the business itself, is a " managing man."

But if we are to speculate on the subject, it seems to me very clear that the court below never used the expression in the sense of a general agent. General agent is a term well known. It is found in all the books, and it would be unpardonable in the court, if the proof was that the secretary was a general agent, that the fact should not have been directly found in so many words. And then again, it is remarkable indeed if the secretary had this authority that he did not exercise it when he made the supplemental contract with the plaintiff. He attempted to bind the defendants by virtue of his official character as secretary. Why did he pass by authority which was ample and resort to that which was deficient? Why did he vouch for the authority of the president in making the original contract, and not make it himself if he had this authority, and relieve the mind of the plaintiff? The reason is apparent. He did not suppose at that time that he had authority in any other capacity than that of secretary. Again, if the secretary had this authority, he never exercised it. He merely expressed his opinion to the plaintiff that the president had authority to bind the defendants, and was doubtless sincere. This was all that was intended. It is all that the language imports. It is not claimed that he attempted to ratify the contract made by the president, but simply that he represented the defendants in making the declaration, so that his declaration became theirs in contemplation of law.

The law in regard to the declarations of agents is well settled. They are not the declarations of the principal unless the agent is transacting his business within the legitimate

scope of his agency, and the declarations accompany and give character to the acts done, so that they form a part of the *res gestæ*. 1 Greenl. Ev., § 113 ; Story on Agency, §§ 134–137.

These are the reasons why I think this claim is unsound.

Again, it is claimed by the plaintiff that the defendants ratified the contract made by their president. Here again the finding does not warrant the inference. It is said that the terms of the supplemental contract were well known to the defendants, and if known, then they infer that the original contract must have been likewise known to them, for they say it was endorsed on the original contract, and expressly refers to it, and the object and occasion of making it cannot well be understood without a knowledge of the original contract, and so they claim that the original and supplemental contracts were well known to the defendants. All that the court below has found on the subject is simply that the supplemental contract was endorsed on the original contract and the sums due under it were paid to the plaintiff, but that no officer of the company, except the president who made it, and the secretary who asserted that it was duly signed to bind the company, knew of the existence of the original contract, and much less of its terms. What reason then is there for supposing that the supplemental contract " was well known to the defendants ?" The sums due under it were paid to the plaintiff, but the court does not inform us who paid them. They were doubtless paid by the party who made it, without the knowledge of the defendants. This must be evident, for the supplemental contract was endorsed on the original contract, and if the original was not known, how could the supplemental be known ?

Again it is said that the defendants must have known that the position occupied by the plaintiff was a difficult one to fill, for the reason that comparatively few persons could be found who possessed the requisite skill and experience. This is altogether conjecture. There is nothing in the finding on the subject. But the counsel for the plaintiff rely very much in this part of the case upon the fact that the sec-

retary was one of the "managing men" of the company, and knew the terms of the contract made by the president, and that his knowledge was in contemplation of law the knowledge of the defendants. I have already commented upon his authority as a "managing man;" but let us concede that he was a general agent, and see how the case will stand upon this question. In addition to what I have already said, let me ask again, what was the agent doing in the line of his agency when he acquired knowledge of the original contract? He was making no contract with the plaintiff himself as agent of the defendants. He simply declared in effect that the president had authority to bind the defendants, which was not true. What has agency to do with that? Was he an agent to make false declarations? to state that *A*, *B*, and *C* had authority to bind the defendants, when they had none whatsoever? I think this will hardly be claimed. If it be said that he was urging the plaintiff to sign the contract, the answer is, that the contract was attempted to be executed by another for the defendants. Did the defendants employ him to urge parties to sign contracts made by unauthorized persons in their behalf? I think this likewise will hardly be claimed. What then was the agent doing in the line of his agency? It seems to me he was doing nothing whatsoever. Unless he acquired knowledge of the contract while engaged in the line of his agency, his knowledge is not in contemplation of law the knowledge of the defendants. The law upon this subject is well stated in the case of *Farmers' & Citizens' Bank* v. *Payne*, 25 Conn., 444. Judge STORRS in that case says:—"The general rule on this subject is, that notice of a fact to an agent is notice to the principal if the agent has knowledge of it while he is acting for the principal in the course of the transaction which is in question. In all of the cases where the question was whether the principal was to be affected by the knowledge of his agent, the latter possessed such knowledge while he was acting for the former. There is none in which it has been held, or indeed claimed, that such knowledge would have that effect while he was not so engaged, nor can we conceive any good reason for the adop-

tion of such a principle." In the case of *Bank of the U. States* v. *Davies*, 2 Hill, 451, Chief Justice NELSON says:—" I agree that notice to a director, or knowledge derived by him, while not engaged officially in the business of the bank, cannot and should not operate to the prejudice of the latter. This is clear from the ground and reason upon which the doctrine of notice to the principal through the agent rests. The principal is chargeable with this knowledge, for the reason that the agent is substituted in his place, and represents him in the particular transaction; and as this relation, strictly speaking, exists only while the agent is acting in the business thus delegated to him, it is proper to limit it to such occasions." Angell & Ames (on Corporations, § 307,) say:—" When however a director is not engaged in the business of the bank, notice to him will not be deemed notice to the bank." Many other authorities might be cited to the same effect.

I have now considered the main points made by the plaintiff's counsel with regard to a ratification of the contract by the defendants. There are other considerations relied upon, but it seems to me they have very little weight in view of the circumstances surrounding the defendants during the time the plaintiff was at work. They had been negotiating a sale of their entire property for seven weeks at least, when the plaintiff appeared and commenced work. At this time they must have been on the point of completing their contract of sale. They knew that their president, secretary, and all their other officers were fully aware of these facts. Now, what was there that would lead a man of ordinary discernment to suppose that their president and secretary had attempted to make a contract with the plaintiff for a term of years? The plaintiff was paid by the week, indicating that he was hired by the week. Simpson, one of the directors, and one of the " managing men" of the company, who resided near the factory and attended daily to its concerns, knew nothing of this extraordinary contract, but supposed the plaintiff was engaged temporarily by the week, and assisted in paying him accordingly. I am therefore of

the opinion that there is nothing in the finding of the court which shows that the defendants ratified the contract made by the president. I think a new trial should not be advised in favor of either party.