## The Ætna National Bank _vs._ The Charter Oak Life Insurance Company.

_W_, who was president of a life insurance company, chartered with no unusual powers, indorsed in its name a note of a railroad company, of which he was also president, and procured the note discounted at the plaintiff bank, the proceeds being put to the credit of the railroad company. The note was a renewal, the proceeds of the original having been applied to the payment of an overdraft of the railroad company at the bank. _W_ had, with the assent of the directors of the insurance company, been the manager of its finances, and had signed and indorsed its paper to a large amount as its president; but it did not appear that he had made any use of the company's name, with the knowledge of the directors, which they considered as binding on the company, except where it was understood that it received the proceeds or the direct benefit of the transaction. Held—1. That the insurance company had

no power to indorse an accommodation note for a third party. 2. That if it had such power, yet *W*, as its president, had no implied authority from the facts stated to sign its name for such a purpose.

The insurance company held $76,000 of a million dollars first mortgage bonds of the railroad company, and all its second mortgage bonds, amounting to $1,250,000, as collateral security for a large indebtedness of the railroad company. The latter had no available funds to pay coupons of its first mortgage bonds that were falling due. The insurance company had before this generally provided for the payment of the coupons by loaning the money to the railroad company; but there existed no agreement on its part to provide for the payment of the coupons now falling due. One *C* was nominally the maker of the note, though it was really the note of the railroad company. *W*, at the time he got the note discounted, said to the officers of the bank that *C* was good, that the railroad company could not then meet its coupons but he hoped it would be able to pay the note when due from earnings of the road, but that if not paid by the maker or the railroad company the insurance company would pay it, that it was for the interest of the insurance company to have the coupons paid promptly to keep up the credit of the bonds, and that it had ample security; and the cashier supposed from this that the discount was virtually for the benefit of the insurance company. Held that these facts were not sufficient to make the indorsement anything else than an accommodation one.

The note was payable to the order of the railroad company and was indorsed by the insurance company before the indorsement of the payee. Held that this form of indorsement under our law was notice that the insurance company was not an indorser for value or in the regular course of business.

No steps had been taken to collect the note of the maker. In this state a blank indorsement by a third party has a definite import, namely, that the indorser will pay the note if, on use of due diligence, it is not collected of the maker.

Our law in this respect is anomalous and often operates to make a different contract from what the parties intended, but it is too well established to be changed except by legislation.

There is no distinction, as to legal effect, between an indorsement by a third person for the better security of the payee, and such an indorsement for the purpose of getting the note discounted at bank.

There was no room for an equitable estoppel against the insurance company; the plaintiffs having had full knowledge of the facts, and having parted with nothing.

Evidence held inadmissible, to show that it was the usage of banks to require all paper discounted to be commercial paper, and all persons indorsing such paper to be bound by their indorsements. Such evidence would be immaterial unless it was intended by it to substitute a contract implied by the usage of banks for that implied by law; and it would not be admissible for that purpose, as the law and not the usage of banks determined the character of that contract.

And held that the testimony of *W* was not admissible for the plaintiffs,

that when he indorsed the note in the name of the insurance company he intended to assume for it the obligation of an indorser to the bank. The legal effect of the indorsement was not to be controlled by his secret intent.

Held also that an opinion was not admissible as to the effect of the non-payment of the coupons of the first mortgage bonds on the value of the second mortgage bonds. This was a matter to be shown by facts, from which the jury could form an opinion for themselves.

Held also that evidence as to the condition of the insurance company as to solvency at the time the note was discounted, was inadmissible. The matter, as bearing upon the necessity of indorsing the note in order to obtain money, was too remote.

The court had power to require the plaintiffs, if they claimed from the blank indorsement anything different from the contract implied by law, to write over it the contract that they claimed.

Such a requirement is proper in such a case as a means of notifying the adverse party what contract the plaintiff claims to have been made.

ASSUMPSIT on an indorsement of a promissory note by the defendants; brought to the Superior Court in Hartford County, and tried to the court on the general issue before *Culver, J.* The declaration contained four counts, the first describing the defendants as second indorsers, the second as first indorsers, and the third as makers; the fourth set forth the facts attending the transaction as implying a promise to pay the note. The following facts were found by the court.

The note on which the suit was brought was as follows:—

"$4,500. HARTFORD, Nov. 1, 1875.

Four months after date I promise to pay to the order of the Connecticut Valley Railroad Company forty-five hundred dollars at the Ætna National Bank, value received.

OLIVER H. CLARK."

The note was indorsed as follows:—

'Charter Oak Life Ins. Co.
    by J. C. Walkley, President.

"J. C. Walkley.

"Conn. Valley R. R. Co.
    by J. C. Walkley, President."

Before the trial the court, on motion of the defendants, made an order that the plaintiffs write over the indorsement of the defendants any contract which they claimed, which differed from the contract implied by law. The facts with regard to this order are fully stated in the opinion. The contract written over the indorsement by the plaintiffs under this order is stated in the finding.

The note was executed by Clark as an accommodation note, and by him delivered to Walkley, as president of the railroad company, and he made the indorsements thereon as above stated, for the purpose of getting the note discounted at the plaintiffs' bank, and the plaintiffs thereupon discounted the note on the credit of the indorsements and of the maker.

When the note fell due, March 4th, 1876, it was duly presented to the maker by the plaintiffs at their banking house and payment demanded, but neither the maker nor the railroad company paid it. Due notice of the demand and non-payment was given the defendants.

It was not proved nor claimed by the plaintiffs that they had ever taken any steps to collect the note of the maker, nor that he was not of sufficient ability to pay it when it fell due, nor that it could not have been collected of him by the use of due diligence.

The plaintiffs did not claim that Walkley had any express authority from the defendants to make the indorsement in their name, but claimed that he had an implied authority by having been in the habit of indorsing paper and other obligations, as president of the company; and I find that, from 1871 till after the date of the note in suit, he was the acting business manager of the defendant company, with the knowledge and consent of its directors, and signed and indorsed its notes, checks and other obligations, to a large amount, as its president. But I am unable to find that he had made any signature or indorsement of the name of the company, as its president, to any paper or obligations of any kind, with the knowledge of the company, or of its officers, which they recognized as binding on it, except when it was

understood that the defendant was to receive the proceeds or direct benefit thereof.

Walkley was president of the railroad company from October 1st, 1869, to April, 1876. He was also president of the defendant company from 1853 to April, 1876.

The plaintiffs claimed the right to prove a special contract by the indorsement different from what is implied by law, and by order of the court, made at the request of the defendants, the following special contract was written over the indorsement:—" On default of payment of the within note according to its tenor, the Charter Oak Life Insurance Company, on due demand and notice of dishonor, promises to pay said note according to its tenor to the Ætna National Bank or bearer." But I do not find that such special contract was made, nor any contract different from that implied by law.

By the 11th section of the defendants' charter it is provided that " all policies of insurance or other contracts, authorized by this act, may be made with or without the seal of said corporation, and shall be signed by the president and secretary, and being so signed and executed shall be binding and obligatory upon said corporation according to the true intent and meaning of such policies."

At the time the note above described was executed by Clark, Walkley, as president of the railroad company, and of the defendant company, and also individually, executed and delivered to Clark an agreement in writing to the effect that the note was made for the benefit of the railroad company, and that they would pay it at maturity, and wholly save him from all loss thereon. But I do not find that this agreement was made by Walkley in pursuance of any authority from the defendant company, express or implied, and it was not proved that the plaintiffs had any knowledge of it till long after the note became due.

The note in suit is a renewal in part of one made and executed by Clark, June 29th, 1875, as an accommodation note for five thousand dollars, payable to the order of the Connecticut Valley Railroad Company at the plaintiff bank,

four months after date, and indorsed precisely in the same
way as the present note. At the time the original note was
executed, Walkley, as president of the defendant company,
as president of the railroad company, and individually,
executed and delivered to Clark an agreement of the same
tenor with that above described.

The plaintiff bank discounted the note June 30th, 1875,
for the accommodation and benefit of the railroad company,
although the cashier supposed, from what Walkley said to
him at the time, that it was virtually for the benefit of the
defendants, and was to be used by the railroad company for
payment of the coupons of the first mortgage bonds.

At this time the railroad company had outstanding one
thousand first mortgage bonds, bearing date December 31st,
1870, each of the denomination of one thousand dollars,
payable thirty years from date, with interest coupons
attached at seven per cent., payable on the first day of
January and July in each year. These bonds at this time
were worth about ninety per cent. The railroad company
had also outstanding second mortgage bonds of the nominal
value of $1,250,000; but their real value was not proved.

At this date, June 30th, 1875, the railroad company was
largely indebted to the defendants, (how much was not
shown,) for which the defendants held all the second mort-
gage bonds, and had held a large amount of the first mort-
gage bonds, as collateral security.

In 1871 the defendants borrowed $230,000 of the Norwich
Savings.Society, and with the consent of the railroad com-
pany pledged $330,000 of the first mortgage bonds as
collateral security therefor. By an arrangement of all the
parties all these bonds except seventy-six had been disposed
of before June 30th, 1875, and the proceeds applied towards
the principal and interest of the loan. The coupons on the
seventy-six bonds were not paid either on July 1st, 1875, or
January 1st, 1876, and in June, 1876, when the lien was
fully paid and settled, were returned to the defendants with
the coupons attached.

Prior to June 30th, 1875, the defendants had generally

provided for the payment of the coupons of the first mortgage bonds by loaning the money to the railroad company. But I do not find that there was any agreement between them and the railroad company to pay the coupons falling due July 1st, 1875.

The railroad company, at this time, had no available funds with which to provide for the payment of the coupons due July 1st, 1875; and the defendants at this time were embarrassed in consequence of the then recent failure of Allen, Stewart & Co., of New York, with which company they had extensive dealings. The coupons due July 1st, 1875, amounted to $35,000.

The defendants at this date had money on deposit in bank amounting to from $145,000 to $148,000, and it was not proved that they had any payments falling due at that time, although their expenses and obligations were very large.

At the time the plaintiffs discounted the five thousand dollar note, June 30th, 1875, Walkley said to the officers of the bank that the maker of the note was good; that the railroad company could not then meet the payment of the coupons falling due July 1st, 1875, yet he hoped it would be able to pay the note at its maturity from earnings of the road, but if not paid either by the maker or the railroad company the defendants would pay it; and that it was for the interest of the defendants to have the coupons paid promptly in order to keep up the value and credit of the bonds, and that the defendants had ample security.

At this time, and for several years previously, the railroad company kept its bank account with the plaintiffs. The defendants had no bank account with the plaintiffs, but kept their account at other banks. The plaintiffs opened no special account with the defendants at the time of discounting the note, and did not agree to pay any coupons with the proceeds of the note, and did not in fact pay any.

At the time this note was discounted the account of the railroad company was overdrawn $5,086.37. The proceeds of the note were $4,863,34, and were credited to the general account of the railroad company, leaving still an overdraft

of $223.03. Walkley said to the cashier, when informed by him that the note had been discounted, that he might place it to the credit of the railroad company, and that the treasurer of that company would want to check out some money for paying coupons on the first mortgage bonds; and on July 1st, 1875, the railroad company was allowed by the plaintiffs to overdraw its account $3,359.70. But I do not find that any portion of this over-draft came directly or indirectly into the hands of the defendants.

Coupons to the amount of $32,340 were paid on the first mortgage bonds July 1st, 1875, of which the plaintiffs furnished $8,000. I do not find that this payment affected the value of either the first or second mortgage bonds.

During the trial William R. Cone, president of the plaintiff bank, and who was such president at the time the note in suit was discounted, being called by the plaintiffs as a witness, was asked the following question:—" Will you state whether or not the note in suit was discounted by your bank on the credit of the Charter Oak Life Insurance Company?" It had been proved on the trial, and admitted, that when the original note was discounted Mr. Cone was absent in Europe, and had no personal knowledge of what was said or done at that time, and that when the renewal note in suit was discounted, nothing was said except that the new note was a renewal of the old one in part. The defendants objected to the question on the ground that the witness should be allowed to state only what was said or done at or before the time of the discount, and the court sustained the objection.

The plaintiffs also offered to prove by Mr. Cone that it is the custom and usage of banks generally to require all paper discounted by them to be bankable or commercial paper, and all persons indorsing the same to be bound thereby. On objection of the defendants the court excluded the evidence.

The plaintiffs asked Mr. Walkley, who presented the note in suit for discount, to state whether or not, when the note was discounted, it was his purpose to make a contract

between the insurance company and the bank. The defendants objected to the question on the ground that the witness should be allowed to state only what was said or done at the time of the discount, and that his secret or unexpressed purpose was not admissible. It not being claimed that the purpose was communicated at the time, the court excluded the evidence.

John W. Stedman was called as a witness by the plaintiffs, and after testifying that he was insurance commissioner in 1874, and part of the year 1875, was asked the following question:—"What was the condition of the defendant company, as to solvency, between January and May, 1875?" The defendants objected to the question, on the ground that the witness could not state his mere opinion or the conclusions to which he had come, from the examination he had made of the company, unless accompanied with the facts upon which that conclusion was based. The court sustained the objection.

The plaintiffs asked Walkley the following question:— "Whether or not, when you indorsed the note for the Charter Oak Life Insurance Company, you intended to assume the obligation of an indorser to the bank?" The defendants objected to the question on the ground that the uncommunicated intent of the witness could not avail unless evidenced by what was said or done at the time. It not being claimed that his intent was communicated at the time, the court sustained the objection.

The plaintiffs offered to show by Walkley that the non-payment of the coupons of the first mortgage bonds due July 1st, 1875, would have greatly diminished the value of these bonds and would have rendered the second mortgage bonds of little or no value. The defendants objected to this question on the ground that it called for the opinion of the witness, who did not profess to be an expert in such matters, and who claimed no special knowledge or means of judging of such probable effect. The court sustained the objection.

The plaintiffs offered Mr. Cone, the president of the bank,

to show that Samuel H. White, secretary and treasurer, and a director of the defendant company, after the note in suit was given, and before it fell due, said to him as such president, that the indorsement of the note by Walkley as president, was a binding obligation on the defendant company, and promised that it should be paid by the company when it fell due. It was proved and admitted that at the time the original and renewal notes were discounted White was absent in Europe, and it was not proved or claimed that he had any personal knowledge of the circumstances under which the discounts were made. On objection of the defendants that it did not appear that White had any authority to bind them by his admissions, the court excluded the evidence.

The plaintiffs claimed, as a matter of law, that on the facts found the defendants were estopped to assert that the contract was *ultra vires*, and that Walkley had no authority to make the indorsement, but the court did not so rule.

Upon these facts the court rendered judgment for the defendants. The plaintiffs moved for a new trial for errors in the rulings of the court, and also filed a motion in error.

*H. Willey* and *C. J. Cole*, in support of the motions.

1. Mr. Walkley was authorized by the insurance company to make the indorsement on the note, and the act was the act of the company. When one has the actual charge and management of the business of a corporation with the knowledge of the members and directors, this is evidence of his authority, without showing any vote or other corporate act constituting him the agent of the corporation, and the company will be bound by his contracts made on their behalf within the apparent scope of the business thus intrusted to him. A. & A. on Corp., § 283; *Goodwin* v. *Union Screw Co.*, 34 N. Hamp., 378; *Northern Central Railroad Co.* v. *Bastian*, 15 Md., 494; *Lester* v. *Webb*, 1 Allen, 34; *Fay* v. *Noble*, 12 Cush., 1; *Olcott* v. *Tioga R. R. Co.*, 27 N. York, 546; *Perry* v. *Simpson Waterproof Manfg. Co.*, 37 Conn., 534. Corporations may make themselves

liable on instruments executed in a different mode from
that provided in their charter. *Bulkley* v. *Derby Fishing
Co.*, 2 Conn., 252; *White* v. *Derby Fishing Co.*, id. 260;
*Topping* v. *Bickford*, 4 Allen, 120. White, the secretary
and treasurer, was absent in Europe when the note in suit
and the original note were given and indorsed, so that there
was no person but Walkley who had any pretence of
authority to sign notes or make indorsements for the
company.

2. The writing on the back of the note, "Charter Oak
Life Ins. Co., by J. C. Walkley, Pres.," was an indorsement
in the commercial sense, and not a guaranty. The purpose
for which the indorsement was made, was not to become a
surety for the maker, but "it is found that Walkley made
the indorsement for the purpose of getting the note dis-
counted at the plaintiffs' bank, and the plaintiffs thereupon
discounted the note on the credit of the indorsements and
of the maker. Clark was an accommodation maker; it
was so understood and agreed by the railroad company and
the insurance company, they giving him their written guar-
anty to pay the note at maturity. They could not have
understood that they contracted to pay the note only after
the payee or holder had exercised diligence to collect the
same of the maker. The law of Connecticut is unquestion-
ably settled, that "the indorsement in blank of a negotiable
note by a third person for the *better security of the payee*,
implies a contract on the part of the indorser that the note
is due and payable according to its tenor, that the maker
shall be of ability to pay it when it comes to maturity, and
that it is collectible by the use of due diligence. *Perkins*
v. *Catlin*, 11 Conn., 223; *Lafflin* v. *Pomeroy*, id., 445;
*Ransom* v. *Sherwood*, 26 id., 441. All these are cases where
the indorsement was made, not for the purpose of getting
the note discounted at bank, but as surety for the maker
for the better security of the payee. In *Case* v. *Spaulding*,
24 Conn., 578, the court held that the contract could be
shown, and that a name on the back of the note written
before the payee could be shown not to have been placed

VOL. L.—12

there as surety for the payee, but to enable the payee to obtain the note to be discounted at bank, and so he was treated as indorser and not as guarantor. Both the defendants and the plaintiffs understood it to be an indorsement in the commercial sense, and treated it as such. There is no law in Connecticut which conflicts with the following rule laid down in *Rey* v. *Simpson*, 22 How., 341:—"If the note was intended for discount, and he put his name on the back of it with the understanding of all the parties that his indorsement would be inoperative until it was indorsed by the payee, he would then be liable only as second indorser in the commercial sense." See also *Good* v. *Martin*, 95 U. S. Reps., 90.

3. The insurance company was an indorser for value, not an accommodation indorser. "An accommodation bill is a bill to which the acceptor, drawer, or indorser, as the case may be, has put his name without consideration for the purpose of benefiting or accommodating some other party who is to provide for the bill when due." Byles on Bills, 100. There was a consideration for the indorsement, and the indorser agreed to provide for the note when it became due. The court has found that "the cashier of the plaintiff bank (at the time the original note was discounted) supposed, from what Walkley said to him at the time, that it was virtually for the benefit of defendants, and was to be used by the railroad company for the payment of coupons of the first mortgage bonds." Also that Walkley said at the same time to the officers of the bank, "that the maker of the note was good, that the railroad company could not then meet the payment of the coupons falling due July 1st, 1875, yet he hoped it would be able to pay the note at its maturity from earnings of the road; but if not paid either by the maker or railroad company the defendants would pay it; *that it was for their interest to have the coupons paid promptly in order to maintain the credit of the bonds, and that the defendants had ample security.*" The insurance company in 1870 and 1871 was doing a large business, and was in receipt of large sums of money from premiums paid.

It was its right and duty to invest these funds, and it did invest a large amount in the bonds of the Connecticut Valley Railroad; they took a large amount of its first mortgage bonds, and all of its second mortgage bonds, $1,250,000, in payment of or as security for advances made and to be made to the railroad company. There was no question as to the legal right of the insurance company to invest its funds in this manner, and prior to June 30th, 1875, it had generally provided for the payment of the coupons of the first mortgage bonds by loaning the money to the railroad company. The insurance company found itself from these investments on that day the owners of $76,000 in first mortgage bonds, and $1,250,000 in second mortgage bonds, and it was bound to do what a prudent individual would do to protect its interest in these bonds. The interest coupons of the first mortgage bonds (there were $1,000,000 of these bonds outstanding) were due July 1st, 1875; if not paid it was certain that the first mortgage bonds would decline in value, and the second mortgage bonds become of no value in the market; and if the first mortgage coupons were not paid in six months the treasurer of the state would take possession of the road, and if not paid within the year the road would be foreclosed and the second bonds become entirely worthless. The railroad company had no funds to pay the interest coupons, and the insurance company was embarrassed in consequence of the then recent failure of Allen, Stevens & Co., with which company it had extensive dealings. In these circumstances it could not spare the money to pay the interest, and Walkley, as its president, obtained the accommodation note of Clark, and it was indorsed by the insurance company to procure money at the plaintiff bank to pay the interest, and the money was obtained by means of the indorsement, and was applied to pay the interest, and thereby the value of the bonds was kept up in the market. Would an intelligent business man have done otherwise? And is there anything in the charter of the insurance company, or any law, which would prevent it from protecting

its property from deterioration and loss. We say then that it was not an accommodation indorsement.

4. The indorsement was not *ultra vires*. A corporation may transact all such business and make all such contracts, where ancillary to its primary business, as may be transacted and made by ordinary individuals under similar circumstances. *Brown* v. *Winnisimmet Co.*, 11 Allen, 334; *Milledge* v. *Boston Iron Co.*, 5 Cush., 175; *Converse* v. *Norwich & N. Y. Transportation Co.*, 33 Conn., 180; *Railroad Co.* v. *Howard*, 7 Wall., 412; *Thompson* v. *Lambert*, 44 Iowa, 239.

5. If the indorsement was *ultra vires*, the defendants are estopped from denying their liability. They procured the note to be discounted on the representation that their interest would be promoted thereby, that they would pay it, and that they had ample security; and it was discounted by the plaintiffs in good faith on the credit of their indorsement and representations. *State Board of Agriculture* v. *Citizens' Street Railway Co.*, 47 Ind., 407; *Zabriskie* v. *C. C. & C. R. R. Co.*, 23 How., 381; *Madison &c. R. R. Co.* v. *Norwich Savings So.*, 24 Ind., 457; *Monument Nat. Bk.* v. *Globe Works*, 101 Mass., 57; *Bissell* v. *Michigan Southern R. R. Co.*, 22 N. York, 258; *Perry* v. *Simpson Waterproof Manf. Co.*, 37 Conn., 520; *Oil Creek &c. R. R. Co.* v. *Penn. Transportation Co.*, 83 Penn. St., 160; *Bradley* v. *Ballard*, 55 Ill., 413; *Thompson* v. *Lambert*, 44 Iowa, 239; Pierce on Railroads, 516 to 519, and cases there cited. It is a familiar principle that " where a party has by his declarations or conduct induced another to act in a particular manner, he will not afterwards be permitted to deny the truth of his admission if the consequence would be to work an injury to such other person." *Dezell* v. *Odell*, 3 Hill, 215; *Fall River Nat. Bank* v. *Buffington*, 97 Mass., 498.

6. If it should be held that by the peculiar law of Connecticut, (and it would be law different from that of any other state) this was a guaranty and not a commercial indorsement, the plaintiffs will be entitled to recover on the fourth count of the declaration; for it would be a guaranty

of an *accommodation note*, and there was no obligation on the part of the holder to use diligence to collect it of the maker, for the reason that the guarantor, having agreed with the maker to save him harmless from the payment of the note, can suffer nothing from the laches of the holder in not pursuing his remedy against the maker. Edwards on Bills, 454, 638; *Mechanics Bank* v. *Griswold*, 7 Wend., 168; *Evans* v. *Norris*, 1 Ala., 511; *Torrey* v. *Foss*, 40 Maine, 74, 80; *Sharp* v. *Bailey*, 9 Barn. & Cress., 44. The liability of the guarantor continues unless he can show that he has sustained prejudice by reason of the failure of the holder to collect of the maker.

7. The orders as to designating the count relied on, and writing the contract claimed over the indorsement, were erroneous. It is the right of a plaintiff to set forth his cause of action in different counts, and the court has no authority to order that he shall designate the count on which he relies; for the purpose of different counts is " to accommodate the statement of the cause as far as may be to the possible state of the proof to be exhibited on the trial, to guard, if possible, against the hazard of the proof's varying materially from the statement of the cause of action, so that if one or more of the several counts should not be adapted to the evidence some other of them may be so." Gould Pl., ch. 4, sec. 4. There is no confusion or uncertainty as to the claims set forth in the different counts of the declaration. The case of *Castle* v. *Candee*, 16 Conn., 223, differs materially from the present case.

8. The court erred in excluding the testimony of Mr. Cone, president of the plaintiff bank, " that it is the usage of banks generally to require all paper discounted by them to be bankable or commercial paper, and all persons indorsing the same to be bound thereby." He was an expert, qualified to testify to the usage of banks, and it was evidence to show that the Ætna Bank understood that the writing on the back of the note was an indorsement in the commercial sense. By showing this, and that Walkley for the insurance company understood and intended it as an indorsement,

we show that the minds of the parties met and that the contract was a contract of indorsement and not a guaranty. It was admissible because commercial custom and usage govern and control, and the contract is presumed to be made in accordance with the usage. *Yeaton* v. *Bank of Alexandria*, 5 Cranch, 51; *Renner* v. *Bank of Columbia*, 9 Wheat., 588; *Mills* v. *Bank of U. States*, 11 id., 431.

9. The court erred in not admitting the testimony of Mr. Stedman, the insurance commissioner, as to the condition of the insurance company as to solvency, between January and May, 1875. It was excluded on the ground that the witness could not state his mere opinion or conclusions to which he had come from the examination he had made of the company, unless accompanied with the facts upon which that conclusion was based. This ruling would have been correct had he not been an expert, but, being an expert, his testimony was admissible. 1 Greenl. Ev., § 440. This testimony was material.

10. The court erred in excluding the testimony of Mr. Walkley on the question whether he intended to assume for the insurance company the obligation of an indorser to the bank, when he indorsed the note. The question was admissible for the purpose of showing that the defendants, by their president, understood and intended the indorsement to be a commercial indorsement, and not a guaranty. *Thurston* v. *Cornell*, 38 N. York, 231; *Fisk* v. *Chester*, 8 Gray, 506; *Skidmore* v. *Clark*, 47 Conn., 20.

11. The court erred in not permitting Mr. Walkley to testify that the non-payment of the first mortgage coupons due July 1st, would have greatly diminished the value of the first mortgage bonds, and have rendered the second mortgage bonds of little or no value. 1 Greenl. Ev., § 440.

*A. P. Hyde* and *C. E. Gross*, contra.

STODDARD, J.* The defendant is a life insurance com-

---

* In this case Judges ANDREWS and STODDARD, of the Superior Court sat in the places of Judges CARPENTER and PARDEE, who were disqualified by interest.

pany, with no unusual powers respecting the subject of this action. A judgment is demanded against it grounded upon an indorsement made in its name upon an accommodation note. The note was made by one Oliver H. Clark, for the accommodation of the Connecticut Valley Railroad Company, was made payable to the order of the railroad company and bore the following indorsements:—" The Charter Oak Life Ins. Co., by J. C. Walkley, President." " J. C. Walkley." " The Conn. Valley Railroad Co., by J. C. Walkley, President." The note was discounted by the plaintiff bank and the proceeds placed by the plaintiff, by direction of Walkley, to the credit of the railroad company upon the books of the bank. When the discount of the original note (the note in suit being a renewal,) was made the railroad company had overdrawn its account with the plaintiff, and after applying the proceeds of the discount upon that account there still remained an overdraft of $223.03.

It is not claimed by the plaintiff that there is any express authority in the charter of the defendant to authorize the use of its name by way of accommodation indorsement to pay the debts or to raise money for the use of the railroad company, nor that the indorsement in question was made by any express authority of the board of directors of the defendant corporation. Of course it is entirely clear that the Charter Oak Life Insurance Company was not chartered to pay the debts, or to raise money for the use, of the Connecticut Valley Railroad Company, and that any use of its name by any agent by way of accommodation indorsement to that end is wholly unwarrantable, illegal, and *ultra vires.* The plaintiff having discounted such accommodation paper, and appropriated the ʾproceeds to the payment of a preexisting indebtedness of the railroad company, must hold the indorsement in question subject to all the ordinary limitations upon the power of an agent of such a corporation to use the name of the principal.

Two considerations are urged by the plaintiff to avoid the application of that salutary principle which forbids an

agent of a corporation to use its property for ends, purposes and objects foreign to the intent of the incorporating act.

First, it is contended that the indorsement of the defendant was made by a person having general authority to use the name of the defendant corporation by way of indorsement without restriction; secondly, that the indorsement in question was not an accommodation indorsement, but was for value and in regular course of business.

Relative to the first contention, the case states that the indorsement was made by J. C. Walkley, who was president of the life insurance company from 1853 and of the railroad company from 1869, to April, 1876, and that "the plaintiff did not claim that Walkley had any express authority from the defendant to make the indorsement as president of the defendant company, but claimed that he had an implied authority by having been in the habit of indorsing paper and other obligations as president of that company; and from 1871 till after the date of the note in suit, he was the acting business manager of the defendant company, with the knowledge and consent of its directors, and signed and indorsed notes, checks and other obligations of the defendant to a large amount as its president. But the court is unable to find that he had made any signature or indorsement of the name of the company, as its president, to any paper or obligations of any kind with the knowledge of the defendant company or of its officers, which they recognized as binding on it, except when it was understood that the defendant was to receive the proceeds or direct benefit thereof." This finding of the court below disposes of this claim of the plaintiff. As president and general manager of the defendant corporation there is nothing in his acts or otherwise to show that Walkley was invested with power to use the name of the defendant except to promote the purposes of its creation and in regular course of its business. Being permitted to sign and indorse the defendant's name upon paper in cases where it "was to receive the proceeds or direct benefit thereof," does not empower such agent to indorse accommodation paper to pay the debts of a third

party. *Perry* v. *Simpson Waterproof Manf. Co.*, 37 Conn., 534; *Swazey* v. *Union Manf. Co.*, 42 id., 559.

It is also said by the plaintiff that this indorsement was for value, in the regular course of business, and therefore that the act of Walkley in making the indorsement was authorized. And in this relation it is found that the defendant held the amount of $76,000 of an issue of a million dollars of first mortgage bonds of the railroad company, and all its second mortgage bonds, amounting to $1,250,000, as collateral security for a large indebtedness to the defendant from the railroad company; the amount of which indebtedness is not found. The interest coupons of the first mortgage bonds were due July 1st, 1875; the railroad company at this time had no available funds with which to pay them, and the defendant was embarrassed by the failure of a New York concern with which it had financial dealings. Prior to June 30th, 1875, the defendant had generally provided for the payment of the coupons by loaning the railroad company the money, but it is not found that there existed any agreement on the part of the defendant to pay the coupons due July 1st, 1875, or to provide for their payment. Walkley, at the time of the discount of the note, said to the officers of the plaintiff that the maker (Clark) was good; that the railroad company could not then meet the payment of the coupons, but that he hoped it would be able to pay the note at its maturity from earnings of the road, but if not paid, either by the maker or the railroad company, the defendant would pay it; that it was for the interest of the defendant to have the coupons paid promptly in order to keep up and maintain the value and credit of the bonds, and that the defendant had ample security. The cashier of the plaintiff bank supposed from what Walkley said to him at the time the note was discounted, that it was virtually for the benefit of the defendant, and was to be used by the railroad company in payment of interest coupons of the first mortgage bonds. The defendant at the time of this discount had on deposit in bank from $145,000 to $148,000 subject to check. The railroad company then and for years

prior thereto kept its account with the plaintiff; the defendant never had any account with the plaintiff, did not agree to pay any of the coupons, and did not pay any. Under these circumstances, there being no contract by the defendant to pay the debts of the railroad company, the plaintiffs claim that the indorsement in question was not an accommodation undertaking, must be based upon the assumption that the bonded indebtedness of the railroad company had in some other way become actually the debt of the defendant, and that the defendant was bound to pay the coupons, for under the facts disclosed in the finding it certainly was not for the interest of the defendant to pay these coupons. Holding but $76,000 of the first mortgage bonds as collateral security, there could be no other object in paying the coupons upon the entire issue of a million dollars except to preserve the speculative value of the entire issue. The real value to the defendant of the $76,000 held by it would be seriously impaired by the payment by it of the coupons due July 1st, 1875, and would have been entirely annihilated by its payment of the coupons due January 1st, 1876. There is nothing to found this claim of the plaintiff's upon, no contract express or implied on the part of the defendant to pay the debts of the railroad company, and no facts in the case to warrant the inference that the payment of these interest coupons would affect the value of the second mortgage bonds directly or indirectly. Indeed it is left doubtful by the finding whether the second mortgage bonds had any value to be protected. It does not appear that they had any value whatever. And without further touching the question of the power of this defendant, chartered for a special purpose, and holding its funds and property in trust for a particular object, to assume as principal debtor the payment of interest coupons to the extent of seventy thousand dollars a year for the purpose of protecting the market value of bonds held as collateral security for an indefinite and unascertained sum, is is sufficient to remark that this act of Walkley's was not in the regular course of business and that he had no power to involve the defendant corpora-

tion in such obligations. Further, it may be noted that when the note was discounted Walkley said to the officers of the plaintiff bank, "that the maker of the note was good, * * that he hoped the railroad company would pay the note at its maturity, * * but that if not paid either by the maker or railroad company the defendant would pay it." Here is a direct, unequivocal statement made to the officers of the plaintiff at the time of the discount that the defendant was to be regarded as a mere accommodation indorser, and that the obligation of the defendant was not to be relied upon except upon the failure of both the maker and the railroad company to pay the note. Again, the form of the indorsement of the defendants' name upon the note was by Connecticut law notice to the plaintiff that the defendant was not *primâ facie* an indorser for value or in regular course of commercial business. *Riddle* v. *Stevens*, 32 Conn., 387.

These considerations, with the fact heretofore stated, that the proceeds of this discounted note were appropriated by the plaintiff and applied in payment of a pre-existing indebtedness from the railroad company to the plaintiff, make further comment on this point superfluous.

Neither is there anything in this case to permit the application of the doctrine of equitable estoppel. The plaintiff was in no wise misled; it had full knowledge, it has parted with nothing.

Another consideration exists equally conclusive against the plaintiff's right to recover in this action. The indorsement in question in the defendant's name is a blank indorsement of a negotiable note by a person not a party to that note. In Connecticut such an indorsement has a peculiar but absolutely settled import. It is found that no contract different from that implied by law existed, and it is further found as follows:—" It was not proved nor claimed by the plaintiff that it had ever taken any steps to collect the note of the maker, nor that he was not of sufficient ability to pay it when it fell due, nor that the same could not have been collected of him by the use of due diligence;" thus

negating the breach of the contract implied by law from such an indorsement. There is no reason why this rule of law should not govern this case. It is true that it is found that Walkley at the time the note was made, as president of the railroad company and of the defendant company, and individually, executed and delivered to Clark, the maker, a writing to the effect that whereas Clark had made the note to the order of the railroad company, in the sum of $4,500, for the benefit of the railroad company, the undersigned agreed to pay the note at maturity and save Clark from all loss thereon. The record however states that the court "does not find that this agreement was made by Walkley in pursuance of any authority from the defendant company, express or implied, and that it was not proved that the plaintiff had any knowledge of it till long after the note became due." This is an attempted use by Walkley of the defendant's name upon an agreement declared in express terms to be wholly for the benefit of the railroad company. When Clark took this agreement and signed the note he had full knowledge that it was a scheme to pledge the credit and property of a life insurance company to secure the payment of a debt of a railroad company without consideration. This was manifestly beyond the powers of Walkley, and Clark had full information regarding all the facts. As the defendant company was not liable on this agreement to Clark, the plaintiff certainly has no rights through an invalid agreement the existence of which was unknown to it. The plaintiff undertakes to draw a distinction between such an indorsement by a third person "for the better security of the payee," and such an endorsement made for the "purpose of getting the note discounted at bank." This distinction is without foundation; no substantial reason is suggested to support it. The person discounting a note is practically the payee; the nature of the transaction with reference to the indorsement is the same; in the one case the payee named in the note refuses it unless he has the indorsement for his "better security," in the other the person refuses to discount the note for the same reason.

None of the decided cases countenance this attempted distinction, and in several the language used by the judges is inconsistent with its existence. By way of illustration see *Riddle* v. *Stevens*, 32 Conn., 387, and *Holbrook* v. *Camp*, 38 id., 24. That of *Case* v. *Spaulding*, 24 Conn., 582–3, cited by the plaintiff counsel, supports no such distinction. That case merely determines the real and true relation of the parties to a note, presents a question of good faith as between indorsers, and was well decided conformably to the doctrine since laid down in *Dale* v. *Gear*, 38 Conn., 18, and *Graves* v. *Johnson*, 48 id., 164, and in similar cases. The fact is that in the state of Connecticut the rule of law applying to indorsements of this character is no part of the law merchant. See remarks of DUTTON, J., in *Riddle* v. *Stevens*, 32 Conn., 386. The rule is peculiar to our state. Eminent judges while admitting have regretted its anomalous existence. See the language of WAITE, J., in *Castle* v. *Candee*, 16 Conn., 238, and of DUTTON, J., in *Riddle* v. *Stevens*, cited above. A line of adjudications from the earliest history of our jurisprudence to the present time forbids further discussion in the courts as to the existence of this peculiar law, and warns us that the office of courts is "*jus dicere*" and not "*jus dare;*" to interpret law and not to make law. Although it may be that in the vast increase in recent years of commercial intercourse between our own and other states and countries, this rule, confined and peculiar to Connecticut, operates to declare a contract in most instances different from the actual intent of the parties, relief is to be had only through legislative action.

At the September term, 1880, of the Superior Court, the defendant moved for an order requiring the plaintiff to write over the blank indorsement of the defendant any contract which the plaintiff might claim to prove differing from that implied by law. The plaintiff objected to the making of such an order. The court however made the following order: "The plaintiff has leave to amend by adding a new count on or before January 15th, 1881, and at the same time to designate the count on which it relies, or in the alterna-

tive, to write the contract which it claims on the back of the note over the indorsement of the defendant." In compliance with this order the plaintiff, on the 14th day of January, 1881, filed the following:

"Ætna National Bank *v.* Charter Oak Life Ins. Co. Hartford County; Supreme Court.

" In the above entitled cause the plaintiff, in compliance with the order of the court, but protesting that said order is illegal and irregular, hereby gives notice that it intends to claim a recovery under the fourth count of the declaration, but does not hereby waive its right to offer evidence to support any other count of the declaration, and does not hereby waive its right to recover upon any other count of the declaration if the facts warrant such recovery."

At the September term, 1881, of the court, at the commencement of the trial, the plaintiff upon request of the defendant refused to designate any one count of the declaration on which it intended to rely, and the plaintiff's counsel read to the court the whole declaration, consisting of four counts, and claimed the right to offer evidence under each of the counts. Thereupon the defendant renewed its motion, and the court required the plaintiff to write over the indorsement on the note, before trial, any claimed contract differing from the one implied by law from such indorsement. This last order was in strict accordance with the rule stated in *Castle* v. *Candee*, 16 Conn., 234, and with the settled practice in cases of this character. So long as the plaintiff relies upon the contract implied by law the defendant is apprised of the plaintiff's claim, but when he seeks to avail himself of his right to prove another and different contract, then, in the language of the court in the case last cited, " we think upon the principles of fair trial that it is the duty of the plaintiff, if required, to fill up the indorsement before trial with the agreement upon which he intends to rely in his proof."

It is unnecessary to determine the effect of the order made in the first instance as limiting the right of a plaintiff to frame his declaration with different counts to meet the

exigency of his proofs, for the plaintiff refused to conform to the order at the trial. That order was then abandoned and a new order made upon which the trial proceeded. The plaintiff was not affected by the original order. No question is here presented whether in a proper case the contract sought to be proved might not be stated alternatively. No claim was made that the plaintiff was uncertain as to what precise contract its evidence would tend to prove. The plaintiff simply refused to inform the defendant what agreement it claimed the defendant had made. It was very proper to require the plaintiff to do this.

Several questions of evidence arose upon the trial and are presented by the record, most of which are unimportant and are not pressed. Some however are insisted upon. William R. Cone, president of the plaintiff bank, was offered as an expert witness " to prove that it is the custom and usage of banks generally to require all paper discounted by them to be bankable or commercial paper, and all persons indorsing the same to be bound thereby." Unless this evidence was offered to contradict the contract implied by law from such blank indorsement, by substituting in place of the contract implied by law a contract implied from the usage and custom of banks, it was wholly immaterial. Nothing indicates that the paper was not " bankable or commercial," or that the persons indorsing it were not " bound thereby." The persons indorsing the note are " bound thereby " according to the rules of law applying to their indorsement and in no other way. If the evidence was offered to prove that banking people generally do not regard such blank indorsement as importing the contract which the Connecticut law implies, it was equally immaterial. Our peculiar rule of law in this particular did not spring into existence through, nor is it dependent upon, the understanding and custom of banks generally.

John W. Stedman, the insurance commissioner, was asked—" What was the condition of the defendant company as to solvency?" This was properly excluded. An inquiry as to the solvency of the defendant company as

bearing upon the necessity of indorsing this note in order to obtain money, is quite remote and inconclusive. And if the defendant was commercially insolvent, that fact would not invest the president or any other agent with peculiar power to use its funds to pay the debts of the railroad company.

J. C. Walkley was asked whether, when he indorsed the note for the Charter Oak Life Insurance Company, he intended to assume the obligation of an indorser to the Ætna bank. This question was properly excluded on the ground stated in the ruling of the court below, that is, that the uncommunicated and unexpressed intent of Walkley was immaterial. Besides this there was properly no question as to whether he in fact "intended to assume the obligation of an indorser." The controversy was as to the legal effect of that indorsement, and that is not to be controlled by his secret intent. His opinion was also properly excluded as to the effect of the non-payment of the interest coupons of the first mortgage bonds upon the value of the second mortgage bonds. If this was material to the issue, such effect could not be shown by the opinion of Walkley, not accompanied by any facts upon which the opinion proceeded. There is nothing to indicate that the witness had any special knowledge, or indeed that the subject was of a character upon which an expert's opinion could be given. The facts being shown it would seem that the court could form an opinion as well as Walkley. Such opinion at the best would have been wholly speculative.

There is no ground for a new trial, and no error in the judgment of the court below.

In this opinion the other judges concurred.